COMMONWEALTH *vs.* JUAN E. CRUZ.

No. 99-P-2042.

Suffolk. May 11, 2001. - December 18, 2001.

Present: LAURENCE, CYPHER, & DOERFER, JJ.

*Evidence,* Hearsay, Prior consistent statement, Declaration against interest, Credibility of witness, Judicial discretion, Expert opinion, Impeachment of credibility, Relevancy and materiality, Cumulative evidence, Medical record. *Witness,* Credibility, Corroboration. *Practice, Criminal,* Fair trial.

At the trial of indictments charging murder and other related offenses, the judge erred in admitting police witnesses' hearsay statements recounting the victim's mother's extrajudicial statements to them on the day of the crimes, alleging the defendant's abuse of the victim, and where the erroneous admission of the inadmissible hearsay corroborating the mother's testimony sufficiently weakened the defendant's case and prejudiced his right to a fair trial "in some significant way," the admission of the evidence constituted reversible error. [398-407]

At a criminal trial, the judge properly barred the defendant from impeaching the Commonwealth's two medical experts with evidence of their alleged isolated mistakes or inconsistencies in wholly unrelated prior cases. [407-408]

At the trial of indictments charging murder and other related offenses, it was permissible for the judge to bar the defendant from introducing evidence (in the form of records from the Department of Social Services) that the victim's mother may have mistreated her children long before the victim's death, where the judge could have excluded the records as irrelevant or, at best, cumulative. [408]

There was no merit to the claim by a criminal defendant that the judge at his trial on indictments for murder and other related offenses erred by excluding psychological records of the victim's mother, particularly where he failed to bear his burden of satisfying all of the procedures established in *Commonwealth* v. *Bishop,* 416 Mass. 169, 181-183 (1993) (as modified in *Commonwealth* v. *Fuller,* 423 Mass. 216, 226 [1996]), which are a prerequisite to obtaining and introducing such privileged communications between patient and psychotherapist. [408]

INDICTMENT found and returned in the Superior Court Department on February 15, 1996.

The case was tried before *Vieri Volterra*, J.

*Charles K. Stephenson* for the defendant.

*Paul B. Linn*, Assistant District Attorney (*Josh Wall*, Assistant District Attorney, with him) for the Commonwealth.

LAURENCE, J. Shortly after noon on Thursday, January 25, 1996, six-year-old Eric Dawood died, the victim of violent physical abuse. Although Eric's body revealed numerous blunt force injuries, the cause of death was (in the opinion of the medical examiner) peritonitis arising from a ruptured duodenum. The rupture had resulted from a severe blow to Eric's abdomen — most likely a kick, stomp, or other rapid and forceful blow — inflicted twelve to forty-eight hours before his death.

A grand jury returned a four-count indictment against the defendant, Juan E. Cruz, who was the live-in boyfriend of Eric's mother, Melissa Dawood. The indictment charged Cruz with first-degree murder (G. L. c. 265, § 1), assault and battery on a child under fourteen causing substantial bodily injury (G. L. c. 265, § 13J), and two counts of assault and battery on a child under fourteen causing bodily injury (G. L. c. 265, § 13J). The same grand jury also indicted Melissa for wantonly and recklessly allowing Cruz to commit bodily injury on Eric (G. L. c. 265, § 13J) on the occasions specified in Cruz's indictment.

At Cruz's six-day trial in January, 1999, the main witness against him was Melissa (who had pleaded guilty to the charges of wantonly and recklessly allowing the abuse of her child, but had not yet been sentenced). After almost four days of deliberations, the jury returned guilty verdicts against Cruz for second-degree murder and for assault and battery on a child under fourteen causing substantial bodily injury. On appeal, Cruz raises numerous issues, only one of which deserves our serious attention; but that one involves error of such significance and prejudice that we are constrained to reverse his convictions.

*The principal evidence against the defendant.* The critical issue presented to the jury at trial was whether Cruz or Melissa — each of whom accused the other of causing Eric's injuries and death — was responsible for an ongoing pattern of physical abuse culminating in the fatal blow. Melissa was the only witness to claim to have seen Cruz physically abuse Eric.

She testified that she had invited Cruz to live with her in

December, 1995. At first, he had helped her care for Eric and had generally treated them both well. On January 19, 1996, however, Cruz admitted to her that he had hit Eric for "poop-[ing] his pants." Melissa noticed red marks on Eric's face, shoulders and side that became darker overnight. Rather than let her mother and sister see the marks, Melissa decided not to take Eric to visit them the next day, as she had planned, but instead told them that Eric and Cruz were having a "guys' day out."[1] On the evening of January 21, 1996, Melissa observed Cruz playing what she called a "pinching game" with Eric. The next morning, she noticed that the back of Eric's legs, or his thighs, were severely bruised from the "pinching."[2] Hoping to hide the many bruises from the teachers at Eric's school, because she feared that their exposure would cause Eric to be taken away from her by the Department of Social Services (DSS) (with which she had had previous involvement not developed in the record), Melissa called the school to say Eric had the flu and would be out all week.

Two days later, on January 24, 1996, Eric became ill (this still according to Melissa's testimony), was lethargic, complained of a stomach ache, and could not hold down food or water. He did manage to walk to his bedroom that evening with Cruz, and Melissa heard Eric giggling as Cruz put him to bed. Late in the morning of Thursday, January 25, 1996, Cruz woke Melissa and told her that Eric had urinated in his bed. Together they carried Eric, who could not stand, walk or speak, to the bathroom to wash him. They then carried him back to his bedroom. As they were trying to dress Eric in clean clothes, Cruz noticed that the child had stopped breathing. Cruz yelled to a friend, who had dropped by the apartment, to call an ambulance. As the ambulance was arriving a short time later, Cruz instructed Melissa to tell the authorities that Eric had fallen down the stairs, and then Cruz ran down the back stairs and out of the building.

Police officers, who came on the scene shortly after the

---

[1] Cruz was acquitted of the assault and battery charge based on this January 19, 1996, incident.

[2] Cruz was acquitted of the assault and battery charge based on this January 21, 1996, incident.

emergency medical technicians (EMTs), testified that they found Eric with his eyes open and rolled back in his head, cold to the touch, lifeless and unresponsive to CPR. They also noticed bruises on his chest and face, a bite mark on his left shoulder, and a "real swollen" stomach. Melissa stood behind the police and EMTs as they vainly tried to revive Eric and followed them downstairs as they put his body into the ambulance. Returning upstairs, she told the inquiring police officers that Eric had developed flu-like symptoms the night before and had not awakened in the morning. She also stated that he had fallen down the stairs a few days earlier while playing, but that she had not called a doctor out of fear that DSS would learn of the incident and take Eric from her.[3]

At some point, the police learned that Eric had been pronounced dead at the hospital and informed Melissa of that fact. She then said she was "going to tell the truth" (so one officer testified). She proceeded to inform the police that Eric had not in fact sustained his injuries as a result of any fall and to recite the substance of her trial testimony, outlined above, about Cruz's physical abuse of Eric. The testimony about Melissa's belated revelations included her having said that "the defendant [had] struck Eric in the face, the chest and the stomach area." A second officer testified that she repeated her allegations regarding Cruz's misconduct, which he had tape recorded, after she was brought to the police station.[4]

After establishing that, at the time of Eric's death, Cruz was five feet, nine inches tall and weighed 195 pounds while Melissa was a "small," "thin," "very frail looking," five feet, two inches tall woman who weighed 105 to 110 pounds, the prosecutor presented the testimony of the medical examiner who had

---

[3]When defense counsel attempted, on cross-examination of an officer, to probe what Melissa had said to the police about the reasons for her fear of the DSS, claiming it was within the excited utterance exception to the hearsay rule, the judge sustained the prosecution's objection, saying the exception did not apply because "[t]he child had been dead for hours before."

[4]Defense counsel persistently objected to the hearsay police testimony reiterating Melissa's statements about Cruz's abuse of Eric, but the trial judge continually overruled the objections on the ground that the statements constituted "admissions against [Melissa's] penal interest," in that she was admitting her failure to protect the child. As noted infra, the Commonwealth concedes that, Melissa being available as a witness, this was error.

performed the autopsy on Eric's body. The examiner had found over 120 bruises of varying ages on the body (including thirteen that were consistent in size and shape with a signet ring seized from Cruz) and had determined the cause of death as most likely being a forceful kick, stomp or other blow to the child's abdomen sustained between twelve hours and two days before death. A physician who directed a child protection team at Children's Hospital also testified, on the basis of photographs, test results and autopsy reports, that the many bruises on Eric's body appeared intentionally inflicted over a period of time rather than accidental. He opined that the fatal injury had resulted from a kick to the abdomen by "a strong person inflicting as much force as he could muster with [a shod] foot [or boot]," and that some of the bruises corresponded to the markings on Cruz's ring. The prosecution also presented evidence that Cruz owned a pair of Timberland boots.

*Cruz's case.* The defense strategy was signaled in counsel's opening statement: Melissa, angry and jealous (because Cruz was seeing other women), was an abusive parent who was responsible for all of Eric's injuries, including the fatal blow. To save herself from the consequences of her impulsive actions, she first engaged in a pattern of lying and concealing facts from everyone, including her family, school authorities, DSS, EMTs and the police, and then falsely implicated Cruz when the enormity of the situation became apparent. Cruz testified that Melissa was not only a neglectful parent (regarding Eric's nourishment, hygiene, and health care) but had also been both verbally and physically abusive to Eric in the days before his death — including pushing, slapping, kicking and dragging him up the stairs, drawing blood. This violence had provoked Cruz's remonstrances, but to no avail because Melissa was frequently "high" on cocaine.[5] She also owned boots and habitually wore several large rings. Cruz denied ever striking Eric and asserted that he himself had attempted CPR on Eric and was the one who initiated the call for an ambulance. He had fled in the aftermath of the tragedy only because he knew there were

---

[5]On cross-examination, Melissa admitted that she would "spank" Eric, especially when he "went to the bathroom on himself."

outstanding warrants for his arrest (on unrelated charges) and he had an unlicensed gun that he kept for protection.

*The basis for reversal.* The Commonwealth concedes, as it must, that the judge erred in allowing the police witnesses' hearsay recounting of Melissa's extrajudicial statements to them on January 25, 1996, alleging Cruz's physical abuse of Eric. The judge did so on the ground that the statements constituted exceptions to the prohibition against hearsay testimony as "admissions against [her] penal interest." Melissa having testified and been present in court, however, her statements failed to meet a foundational requirement of such an exception, that the declarant be unavailable. See *Commonwealth* v. *Charles*, 428 Mass. 672, 677 (1999).[6]

The Commonwealth attempts, however, to validate the admission of that hearsay evidence by resort to a principle it contends is of general application: namely, it argues that "[i]f evidence is admissible under any theory supported by the record, 'it is of no consequence whether the precise reasons assigned by the [trial] judge are accurate' " (quoting from *Commonwealth* v. *Cast*, 407 Mass. 891, 897 [1990]). That principle applies here, the Commonwealth posits, because the police witnesses' repetition of Melissa's January 25, 1996, statements fingering Cruz as the person responsible for harming Eric were admissible as "prior consistent statements" introduced "to rebut an implication that the witness's story is a recent fabrication" (citing

---

[6]We also doubt the statements satisfied the two other requirements for so-called admissions against penal interest. Melissa's statements to the police were not "truly" against her penal interest because they did not "so far tend[] to subject [her] to criminal liability that a reasonable person in [her] position would not have made the statement[s] unless [s]he believed [them] to be true." *Commonwealth* v. *Charles*, 428 Mass. at 677. Rather, they entirely incriminated Cruz for Eric's injuries, and the only adverse consequence contemplated by Melissa was the civil one of loss of custody to DSS. It is, therefore, questionable whether Melissa, whom the prosecution took pains to portray as borderline retarded, would have been aware of any self-inculpatory implications of her statements. See *Commonwealth* v. *Drew*, 397 Mass. 65, 74 (1986). There were additionally no "corroborat[ing] . . . circumstances clearly indicating [their] trustworthiness," *Commonwealth* v. *Charles*, 428 Mass. at 677, particularly since Melissa had already admitted to lying multiple times about Eric's injuries, did not make the statements spontaneously, and had a patent motive to misrepresent the matter. See generally *Commonwealth* v. *Drew*, 397 Mass. at 73-75.

*Commonwealth* v. *Rivera*, 430 Mass. 91, 99-100 [1999]). The Commonwealth's after-the-fact rationale does not survive analysis, for several reasons.

First, the officers' testimony as to Melissa's statements casting all blame for Eric's death on Cruz failed the most fundamental tests for common law hearsay exceptions: a "strong necessity" for evidence which the fact finder would otherwise never receive; and a "guarantee of trustworthiness in the circumstances surrounding the making" of the statements. Liacos, Massachusetts Evidence § 8.4.1, at 477 (7th ed. 1999). Since Melissa herself testified, there was no need for the effective repetition of her testimony, much less a strong necessity. Given her succession of lies regarding Eric's injuries, the lack of spontaneity in her statements to the police, her exculpatory change of story immediately upon learning of the extremity of the situation, and her expressed concern even prior to the fatal incident that the authorities would hold her responsible for Eric's physical abuse, it could not be said that there existed any guarantees of trustworthiness in the circumstances surrounding Melissa's accusations against Cruz.[7]

Nor is the principle on which the Commonwealth relies either as general or as applicable to this case as it contends. The authority cited by the Commonwealth for the proposition — *Commonwealth* v. *Cast*, 407 Mass. at 897, which in turn relied upon *Commonwealth* v. *Signorine*, 404 Mass. 400, 403 n.1 (1989) — did not in fact involve any hearsay evidence, but rather illegal drugs that each defendant had unsuccessfully moved to suppress on the ground that the police seizure lacked probable cause. Each case featured extensive findings by the motion judge sufficient to support the appellate conclusion that the officers had probable cause to search for and seize the

---

[7]The Commonwealth does not and could not challenge the judge's correct ruling that Melissa's statements were not subject to the hearsay exception for excited utterances (see note 3, *supra*). When properly qualified, such utterances are viewed as particularly trustworthy and reliable, but the guiding principle is that the statement must be made before there is time to contrive — a condition that would not be satisfied here (see *infra*). See *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 223 (1973); *Commonwealth* v. *Santiago*, 52 Mass. App. Ct. 667, 671-672, 674-676, further appellate review granted, 435 Mass. 1105 (2001).

contraband, notwithstanding certain erroneous determinations by the judge.[8] No equivalent fact finding by the judge exists in this case to provide support for the admission of otherwise inadmissible hearsay on the Commonwealth's alternative "prior consistent statement" theory.

Before a witness's prior consistent statement may be admitted, the trial judge must exercise discretion to determine whether the circumstances warrant the admission of such hearsay, and special judicial attention must be directed to the issue whether the statement was made before or after the witness had an incentive to fabricate her testimony. See *Commonwealth* v. *Zukoski*, 370 Mass. 23, 27 (1976); *Commonwealth* v. *Rivera*, 430 Mass. at 100. Such statements, moreover, "should be allowed only with caution, and where the probative value for the proper purpose is clear." *Commonwealth* v. *Lareau*, 37 Mass. App. Ct. 679, 683 (1994), quoting from *Commonwealth* v. *Darden*, 5 Mass. App. Ct. 522, 528 (1977). The trial judge engaged in no such exercise here and made no findings that would reflect the requisite cautious, discretionary analysis[9] — unsurprisingly, since he never contemplated, much less relied on, the eviden-

---

[8] In *Commonwealth* v. *Cast, supra*, the judge had erroneously determined that an informant's tip, on which the police relied for probable cause to arrest and search the defendant, possessed veracity (under the "basis of knowledge" and "veracity" tests established for informant cases by the Supreme Court of the United States, see *Commonwealth* v. *Robinson*, 403 Mass. 163, 164-166 [1988]) by containing a statement against penal interest; the error was, however, inconsequential because other facts found by the judge established the requisite veracity. In *Commonwealth* v. *Signorine, supra*, the judge had erroneously concluded that, since there was probable cause to believe the defendant to be a drug dealer, it reasonably could be inferred that his automobile would contain drugs; however, the error was harmless, because the police had a valid warrant authorizing search of the defendant's residence and a specific automobile "on the premises," an automobile the police executing the warrant observed the defendant drive to and park "within the curtilage" of the premises, making it susceptible to search under well-settled principles.

[9] The judge overruled Cruz's counsel's repeated objections to the police recitation of Melissa's statements with the unadorned statement that they were "admissions against penal interest." Only once, during a sidebar conference, did he attempt to explain his ruling, on the ground that the statements were subsequently the basis for the Commonwealth's prosecution of Melissa for failing to protect Eric — an insufficient basis for admitting such hearsay. Compare *Commonwealth* v. *Charles*, 428 Mass. at 677-680.

tiary theory now advanced by the Commonwealth. See *Commonwealth* v. *Almeida*, 42 Mass. App. Ct. 607, 614-615 (1997).

It is also apparent that the "evidence admissible under any theory" principle cannot literally be of universal application. There are different levels and purposes of admissibility with respect to different hearsay exceptions, and the evidentiary consequences may differ considerably depending on the proper theory. This case furnishes an example of that reality. Declarations against penal interest are admissible for the truth of the matters asserted. See *Commonwealth* v. *Charles*, 428 Mass. at 676-680; Liacos, Massachusetts Evidence § 8.10, at 516 (7th ed. 1999), and authorities cited. Prior consistent statements, however, when allowable under the narrow hearsay exception, have long been deemed inadmissible as substantive evidence and entitled only to a restricted admissibility (under a proper limiting instruction) for the sole purpose of rehabilitating the credibility of a witness-declarant who has been impeached on the ground that her trial testimony is of recent contrivance. See *Commonwealth* v. *Jenkins*, 10 Gray 485, 487-490 (1858); *Commonwealth* v. *Zukoski*, 370 Mass. at 26-27; *Commonwealth* v. *Rivera*, 430 Mass. at 99-100.[10]

The application of an erroneous evidentiary theory in Cruz's

---

[10]These authorities note that prior consistent statements may also be admitted when offered in response to a claim of bias or inducements affecting the witness, at least when shown to antedate the development of the bias or inducements. Such other rationales are not here implicated.

Under Fed.R.Evid. 801(d)(1)(B), and its cognate, Proposed Mass.R.Evid. 801(d)(1)(B), prior consistent statements of a witness are not hearsay but rather substantive evidence when used to rebut a charge of recent fabrication (or recent improper influence or motive). (See the advisory committees' notes to the sections in the two sets of rules.) However, even for that expanded purpose they are admissible only when shown to have been made at a time prior to the existence of the alleged fabrication (or influence or motive). See *Tome* v. *United States*, 513 U.S. 150, 156-166 (1995). We are aware that eminent scholars and judges have criticized the rule limiting the use of prior statements of a witness to the issue of credibility rather than affording them substantive effect (especially because of the asserted fiction of expecting a jury to be able to discriminate properly between these evidentiary concepts and particularly when the declarant is available for and subject to cross-examination, cf. *Commonwealth* v. *Daye*, 393 Mass. 55, 72 [1984], and authorities cited). Until the long-established rule here applied has been expressly altered by the Supreme Judicial Court (see, e.g., *id.* at 69-72; *Flood* v. *Southland Corp.*, 416 Mass. 62, 68-70 [1993]), we are bound to honor it.

case was, therefore, of great consequence. It transformed evidence that should have been confined to supporting the witness's credibility into evidence that the jury could accept as proof of the truth of the facts asserted in the hearsay statements. Of necessity, it also denied the defense the right and opportunity to request a proper limiting instruction.

The more basic flaws in the Commonwealth's argument, however, are its fallacious premises: that Melissa's extrajudicial incrimination of Cruz, as testified to by the officers, was properly admissible as a prior consistent statement; and that, even if it was erroneously admitted on any basis, the error was not prejudicial to Cruz. As an initial procedural observation, we note that it was wrong for the Commonwealth to attempt to "pump[] up," *Commonwealth* v. *Kindell*, 44 Mass. App. Ct. 200, 202 (1998), quoting from 4 Wigmore, Evidence § 1124 (Chadbourn rev. ed. 1972), Melissa's testimony in its direct case, even were the "prior consistent statement" exception applicable. It is true that the prosecutor may, in certain circumstances, attempt to deflect an anticipated defense accusation of recent fabrication by presenting a prior consistent statement in direct examination, rather than in the customary manner of introducing it on redirect or rebuttal to rehabilitate the witness after her impeachment by an inconsistent statement on cross-examination. See *Commonwealth* v. *Saarela*, 376 Mass. 720, 722-723 (1978).

Permitting such a deviation in the presentation of evidence is, however, a matter for the trial judge's discretion, the exercise of which was here never even contemplated. See *Commonwealth* v. *Martinez*, 425 Mass. 382, 396-397 & nn.15-16 (1997). The discretionary allowance of such a change in the order of presentation of proof is appropriate only when it is clear that a defense claim of recent contrivance by the witness is "unavoidable or 'inevitable.' " *Id.* at 397. Such was not the instant situation. Far from accusing Melissa of recent fabrication, the explicit defense strategy throughout, from opening through cross-examination to summation, was that she had always been a self-serving opportunist who had motivation to lie, and had

See *Bergendahl* v. *Massachusetts Elec. Co.*, 45 Mass. App. Ct. 715, 726 (1998), cert. denied, 528 U.S. 929 (1999), and cases cited.

indeed lied, about Eric's physical abuse from the outset —
initially to avoid the reproach of and hide the facts from her
family and school authorities, then to prevent DSS from remov-
ing Eric from her custody,[11] subsequently to protect herself from
punishment for the abuse, and finally to avoid responsibility for
his death, as well as to retaliate against Cruz for his lack of
fidelity to her. No claim of "recent" contrivance by Melissa
was ever made or was even reasonably foreseeable as defense
strategy.

Had the evidence been presented in the correct order, the
testimony of the officers would not have been admissible, for
the defense impeachment strategy was not based on a theory of
recent, but rather of original and long-maintained contrivance,
and no other hearsay exception would have been applicable. In
light of Melissa's admitted, self-protective, and persistent pat-
tern of lying about and concealing the facts regarding Eric's
physical condition, it is evident that her motive to fabricate and
to implicate Cruz preceded her statements to the police, arising
no later than the day of Eric's death, and would have been at
work at the time she spoke to the police under the unavoidably
overhanging threat of arrest for being the person responsible for
Eric's fate. Given such a time frame, even had the prosecutor
sought to invoke the exception for prior consistent statements,
his effort would have been unavailing upon a proper exercise of
the trial judge's discretion. See and compare *Commonwealth* v.
*Zukoski*, 370 Mass. at 26-28; *Commonwealth* v. *DiLego*, 387
Mass. 394, 395, 399-400 (1982); *Commonwealth* v. *Healy*, 393
Mass. 367, 383-384 (1984); *Commonwealth* v. *Darden*, 5 Mass.
App. Ct. at 527-530; *Commonwealth* v. *Kirby*, 18 Mass. App.
Ct. 960, 961 (1984); *Commonwealth* v. *Binienda*, 20 Mass.
App. Ct. 756, 759 (1985).

The Commonwealth's ultimate assertion, that Cruz could not
have been prejudiced by the erroneously admitted hearsay, is
especially unpersuasive. Its basis for this contention — that the

---

[11]Although the trial judge refused to allow defense counsel to explore the
details of Melissa's relationship with DSS in connection with her parenting of
Eric and several other children, she admitted, during both direct and cross-
examination, to an ongoing involvement with DSS, a regular withholding of
information about Eric from her DSS "social worker," and a continuing fear
that DSS would take Eric away from her if they learned of his physical abuse.

statements "added nothing of substance to the Commonwealth's case" — is simply wrong. The police recounting of Melissa's January 25, 1996, version of events was in fact more graphic and detailed than Melissa's trial testimony, in that the police version had her reporting that "the defendant [had] struck Eric in the face, the chest *and the stomach area*" (emphasis added). Melissa, the Commonwealth's only percipient witness as to Cruz's responsibility for Eric's injuries, did not testify that she had ever seen Cruz strike Eric in the stomach.

The forensic experts having opined that the fatal injury had been inflicted by a severe blow to the abdomen rupturing Eric's duodenum, it is difficult to conceive of a more prejudicial statement in the circumstances.[12] It went beyond and added substantially to Melissa's incriminating account in a manner that might even be said to have filled a gap in the Commonwealth's case. See *Commonwealth* v. *Lareau*, 37 Mass. App. Ct. at 682-684 (despite limiting instructions, prejudicial error was created by the erroneous admission of police recounting of key witness's prior consistent statement, made after a motive to falsify came into existence, because the police testimony included details as to defendant's assault on the victim that went beyond witness's own testimony and might have been considered evidence of the truthfulness of the underlying statement). Cf. *Commonwealth* v. *Scanlon*, 412 Mass. 664, 670 (1992) (hearsay testimony introduced under the "fresh complaint" exception is impermissible when it adds damaging details not testified to by the declarant that "fill gaps in the prosecution's case"); *Commonwealth* v. *Flebotte*, 417 Mass. 348, 351-352 (1994) ("fresh complaint" hearsay improperly exceeded the scope of the declarant's testimony because it "added to it substantively").

Even when an improperly admitted prior consistent statement does not exceed the scope of the declarant's testimony, our appellate courts have long noted that such evidence "from its very nature . . . may be likely to influence the jury as substantive evidence of its own truthfulness. . . . [and constitutes] an illegitimate influence . . . so great" that its admission should be

---

[12]In common parlance, the stomach and the abdomen are essentially synonymous. See American Heritage Dictionary 1769 (3d ed. 1992).

exceptional. *Commonwealth* v. *Tucker*, 189 Mass. 457, 484 (1905). We have recognized that limiting instructions from the trial judge as to the use of a prior consistent statement solely for impeachment purposes do not necessarily cure or avoid the latent prejudice "because of the ever present danger that the jury will, despite instructions, consider the prior consistent statement as evidence of the facts therein asserted." *Commonwealth* v. *Darden*, 5 Mass. App. Ct. at 528. Limiting instructions as to the restricted use of hearsay evidence are of particularly questionable curative value when, as here, the case against the defendant is not overwhelming[13] and the prosecutor urges the jury to consider the hearsay evidence as enhancing the reliability of the declarant's testimony — here the incrimination of Cruz by Melissa, the only witness to claim to have seen Cruz ever strike Eric. In such circumstances, we doubt it could be said with fair assurance that the jury did not attach substantial significance to the police iteration and amplification of Melissa's testimony in a manner that adversely affected Cruz's substantive rights.[14] See *Commonwealth* v. *Rosa*, 412 Mass. 147, 158-160 (1992); *Commonwealth* v. *Binienda*, 20 Mass.

---

[13]The Commonwealth does not contend that its evidence was so strong that any prejudice was without significant effect, but asks us to find harmlessness in the fact that "[d]espite the detectives' corroboration [of] . . . Melissa's assertions" the jury acquitted Cruz of the two charges about which she was most specific (see *infra* and notes 1 & 2, *supra*). However, "[t]here is danger in speculation long after the fact about what impact inadmissible evidence may have had on a jury's reasoning." *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. 789, 798 (1985). See note 15, *infra*. Aside from the forensic opinions, the case came down to a duel of credibility between Cruz and Melissa. Indicative of the difficulty the evidence presented to the jury was the fact that after three and one-half days of deliberations they returned verdict slips finding Cruz guilty only of involuntary manslaughter on the murder count, guilty on the aggravated assault count, and not guilty as to the January 19th assault, and reported not having reached a verdict as to the January 21st assault charge. Afforded the options of having the three returned verdicts then recorded or deliberating further to try to return all four verdicts together, they elected the latter course, which they did after deliberating for a fourth day. It is noteworthy that the jury acquitted Cruz on the only counts as to which Melissa provided eyewitness testimony, while convicting him of the more serious charges based on the fatal blow to Eric's "stomach."

[14]In an emotionally charged closing argument, the prosecutor (who ended his peroration with the questionable exhortation, "Now is the time for justice. Let him have it") emphasized that after Melissa told her story to the police officer in her apartment, "[s]he told the same story in detail to Sergeant Hors-

App. Ct. at 759-760 (hearsay erroneously admitted as a prior consistent statement was prejudicial despite limiting instructions because of the inherent danger of jury misuse of the statements as substantive evidence). See also *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445-446 (1983) (generally as to evaluating error for harmlessness).

All the more prejudicial must the improperly admitted police testimony have been here. There were no limiting instructions,[15] and the jury were encouraged and were left free to treat the prior consistent statements — including their critical elaboration by the police to include Cruz's striking Eric in the stomach — as evidence of the truth of the facts therein asserted. See *Commonwealth* v. *Almeida,* 42 Mass. App. Ct. at 614-615 (judge admitted witness's prior consistent statements under an erroneous hearsay theory and gave no limiting instructions appropriate

---

ley later that afternoon [at the police station]. . . . She told you the same story here. . . . Her testimony and her description of what happened to the detectives . . . was consistent." Having supported the admissibility of the hearsay on the "admissions against penal interest" theory, the prosecutor clearly intended the jury to accept the police testimony as affirmative evidence substantiating Melissa's accusations against Cruz. Since the jury were never informed, through appropriate limiting instructions, to regard the police repetition of Melissa's story only to the extent it rebutted a defense imputation of recent fabrication, but not as substantive evidence of the facts contained therein, we are left with grave doubt that the jury did not regard Melissa's testimony as artificially "pumped up," *Commonwealth* v. *Kindell,* 44 Mass. App. Ct. at 202, and rendered more trustworthy by the police corroboration. See *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445-446 (1983). Cf. *Commonwealth* v. *Trowbridge,* 419 Mass. 750, 761-762 (1995) (reversible error occurred when the Commonwealth's case relied heavily on a significant amount of hearsay fresh complaint testimony that may have "len[t] undue credibility" to the complaining witness, and when the trial judge, while instructing that such testimony could only be used "to corroborate" the witness's story, failed to define the concept of corroboration, so that there existed " 'the risk that the jury would use such evidence substantively,' " quoting from *Commonwealth* v. *Scanlon,* 412 Mass. at 674).

[15]In view of the trial judge's repeated rebuffs to defense counsel's objections to the introduction of such testimony on the rationale that it fell within the "admission against penal interest" exception, counsel's failure to have requested an appropriate "prior consistent statement" instruction limiting the hearsay to rehabilitating Melissa's credibility and rebutting her attempted impeachment, but forbidding its use as affirmative evidence of the truth of her story, was understandable in the circumstances and not an omission that affects the applicable standard of review. See *Commonwealth* v. *Cutty,* 47 Mass. App. Ct. 671, 677 n.7 (1999).

to such statements, so "the jury heard inadmissible testimony corroborating [the principal witness's] version of the events. The defendant's credibility had been pitted against the [witness's], and the piling on of corroborative testimony could have materially affected the jury's deliberations . . . [because of] the danger of prejudice inherent in repetitive testimony which corroborates a witness's testimony" [citations omitted]).[16]

In fine, we conclude that the erroneous admission of the inadmissible hearsay corroborating Melissa's testimony sufficiently weakened Cruz's case and prejudiced his right to a fair trial "in some significant way," *Commonwealth* v. *Cyr*, 425 Mass. 89, 95 (1997); *Commonwealth* v. *Esteves*, 429 Mass. 636, 639-641 (1999), that the judgments must be reversed.

The remaining issues raised by Cruz can be addressed briefly.

1. We agree with the Commonwealth that the trial judge properly barred Cruz from impeaching the prosecution's two medical experts with evidence of their alleged isolated mistakes or inconsistencies in wholly unrelated prior cases. Such evidence was, under well-established principles, either legally irrelevant to the reliability of the experts' testimony here or, if marginally

---

[16]Cf. *Commonwealth* v. *Raymond*, 424 Mass. 382, 388 n.6 (1997) ("The Commonwealth's argument that the [police testimony as to a crime participant's extrajudicial statement to the police incriminating the defendant] was essentially the same as [that witness's] trial testimony and therefore was only cumulative evidence is not conclusive. The statement was introduced precisely because it does mirror [the witness's] trial testimony, and therefore might have a tendency to reinforce and corroborate [that] testimony. Therefore, the statement could have a prejudicial effect even though it contained no new information implicating [the defendant])"; *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. 789, 797-798 (1985) ("Although the circumstantial evidence against the defendant[] was surely strong . . . it was not overwhelming . . . [and w]e are unable to conclude that the [hearsay testimony by a police witness about a victim's equivocal extrajudicial identification of defendant's photograph, which was erroneously admitted as substantive evidence and not limited by appropriate instructions] could not possibly have been significant to the jury in their deliberations. . . . Indeed, as a tangible link to [the defendant] which the jurors could see and ponder during their deliberations, the picture was quite strong. . . . The prosecutor thought so. In closing argument, he referred to [the extrajudicial evidence] in a way that enhanced its credibility as probative evidence. . . . On balance there was enough potential force to the [improperly admitted hearsay] that we cannot shrug off the error attending its admission as harmless." [Citations omitted.]).

relevant, was excludable in the judge's discretion as an unduly time-consuming, collateral and confusing diversion. Determining that the witnesses' prior testimony as experts in other cases did not demonstrate bias was also well within the judge's discretion; nor has Cruz shown how that testimony logically reflected or tended to show bias or incompetence in any manner relevant to the facts of this case, or how its exclusion was productive of discernible prejudice to his defense.

2. It was, as the Commonwealth argues, permissible for the judge to bar Cruz's introduction of evidence (in the form of DSS records) that Melissa may have mistreated her children long before (primarily in 1989 and 1990) Eric's death, which Cruz appears to have offered for the patently improper purpose of attempting to show that such "prior bad acts" revealed Melissa's propensity to have mistreated Eric. Since the Commonwealth never disputed, and indeed frankly acknowledged, Melissa's serious deficits and faults as a neglectful parent, and because Melissa freely acknowledged her fear of DSS intervention due to her parental shortcomings and her lies to avoid it, the judge correctly could have excluded the records as irrelevant or, at best, cumulative.

3. Cruz's claim that the trial judge erred by excluding Melissa's psychological records is without merit, particularly since he failed to bear his burden of satisfying all of the procedures established in *Commonwealth* v. *Bishop*, 416 Mass. 169, 181-183 (1993) (as modified in *Commonwealth* v. *Fuller*, 423 Mass. 216, 226 [1996]), which are prerequisite to obtaining and introducing such privileged (see G. L. c. 233, § 20B) communications between patient and psychotherapist. Indeed, Cruz has failed to show how such records were legally relevant to his defense, much less required for a fair trial. His stated purpose of using them, to reveal to the jury that Melissa had a "short fuse" and was "prone to emotional reactions and impulsive behavior" — apparently to suggest that such character traits made her more likely to have inflicted Eric's fatal injury — was manifestly improper.

4. In light of our reversal of the judgments, there is no need to address Cruz's challenges to the trial judge's denials of his motions to reduce the murder verdict to manslaughter pursuant

to Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979), and to dismiss the count alleging assault and battery on a child causing substantial bodily injury, on the ground that it was a lesser included offense to murder and his conviction thereof was thus duplicative of his murder conviction.

*Judgments reversed.*

*Verdicts set aside.*